Charles Herbert WHITE, Petitioner,

v.

Harold R. SWENSON, Warden,
Respondent.

No. 1347.

United States District Court
W. D. Missouri,
Central Division.

May 2, 1969.

See also 301 F.Supp. 470.

Robert G. Duncan, Kansas City, Mo., for petitioner.

John C. Danforth, Atty. Gen., State of Missouri, Jefferson City, Mo., for respondent.

# MEMORANDUM AND ORDER GRANTING WRIT OF HABEAS CORPUS

JOHN W. OLIVER, District Judge.

This is a state prisoner habeas corpus case in which we need reach only the federal search and seizure question presented. For reasons we shall state, the writ must be granted. Execution of the writ, however, will be stayed in order to permit the State of Missouri to determine whether petitioner will be granted a new trial.

## I.

The first opinion written by the Supreme Court of Missouri in this case did not reach the federal search and seizure question on the merits. See State v. White, (Sup.Ct. of Mo.Div. 2, 1966) 408 S.W.2d 31, in which petitioner's conviction was affirmed on direct appeal. The court there applied its state rules of procedure in a manner which determined that "no point is preserved involving the court's action in overruling the motion to suppress" (408 S.W.2d at 34).[1] Be-

[1] The question of whether the Supreme Court of Missouri's appellate practice of reaching a federal search and seizure question on direct appeal in some cases and refusing to do so in others involving the same procedural circumstances is in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment is not presented in this case. Study of Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and its many progeny puts that question in focus. *Griffin* states the controlling principle that "constitutional guaranties of due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons."

State v. Edmondson, (Sup.Ct. of Mo., Div. 1, 1964) 379 S.W.2d 486, is but one of the numerous cases in which a search and seizure question was reached by the Supreme Court of Missouri on direct appeal although no motion to suppress was filed in the trial court.

In the more recent case of State v. Harrington, (Mo.Sup.Ct., Div. 2, 1968) 435 S.W.2d 318, however, the Supreme Court of Missouri refused to reach the federal search and seizure question on the merits on the ground that no motion to suppress had been filed in the trial court. See also State v. Howe, (Sup.Ct. Mo., Div. 1, 1963) 364 S.W.2d 546, for a similar case.

Both *Harrington* and *Howe*, as pointed out by Judge Barrett's and Judge Donnelly's dissent in *Harrington*, are inconsistent with federal rule. See also Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921).

Adoption of a piecemeal appellate practice in regard to federal search and seizure questions does not affect the jurisdiction of a federal habeas corpus court. See discussion in White v. Swenson, (W.D.Mo. en banc 1966), 261 F. Supp. 42 at 50. See also Kaufman v. United States, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227, decided March 24, 1969, in which the Supreme Court of the United States, as did this Court in 1966, indicated its approval of Judge Skelly Wright's dissent in Thornton v. United States, (1966) 125 U.S.App.D.C. 114, 368 F.2d 822, in regard to the scope of habeas corpus in search and seizure cases in which no motions to suppress were filed in the trial court. See also and compare Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642,

cause it elected to postpone consideration of the federal search and seizure question on direct appeal, that question was not decided on the merits until the Supreme Court of Missouri heard a second appeal in which it affirmed the trial court's denial of petitioner's Missouri Rule 27.26, V.A.M.R. motion. See White v. State, (Mo.Sup.Ct., Div. 2, 1968) 430 S.W.2d 144. The question presented to this Court is whether controlling federal Fourth Amendment principles and standards were properly articulated and applied to the facts reliably found by the Missouri courts, to which appropriate deference may and will be given.

Although the Supreme Court of Missouri stated that its review of petitioner's state postconviction proceeding was "limited to a determination of whether the findings, conclusions and judgment of the trial court are clearly erroneous" under Rule 27.26(j) (430 S.W.2d at 146), the findings of fact of the trial court were not set forth in its opinion. It is apparent that the findings of the Supreme Court of Missouri differed from those of the trial, both in form and in substance. The Supreme Court of Missouri stated the facts as follows:

At the hearing on the motion to suppress, and at the hearing on the motion filed pursuant to Rule 27.26, the testimony disclosed that Detective Sergeant Charles B. McKinnie was told by an informant that defendant was the person who committed a recent burglary of a drugstore in which narcotics had been stolen, and that defendant and narcotics which had been taken in that burglary, and possibly other narcotics, were in a house at 2104 East 59th Street, Kansas City, Missouri. Sergeant McKinnie knew the defendant, and he knew his reputation as a burglar and a narcotics user. He also knew that the robbery referred to had occurred. He had known his informant for 18 to 20 years, he knew him to be reliable, and he had many times received accurate information from him. Sergeant McKinnie stated that he considered the time element to be important, and approximately forty minutes after the information was received he and two officers arrived at the address furnished by the informant. One of the officers knocked on the door, and immediately thereafter they heard what they thought was a woman in the house screaming or calling for help. Sergeant McKinnie removed a screen from a window and looked in the house and saw defendant standing in the living room dressed only in shorts and holding a large roll of money. Defendant opened the door and he was told that he was under arrest. As the result of a search narcotics were found in the basement in a cereal box on the top of the furnace. While attempting to locate the woman that had been previously heard, Detective McKinnie looked in the bedroom and saw a hypodermic syringe and paraphernalia ordinarily employed in the use of narcotics. Defendant told the officers that the screaming of the woman was a part of a "soap opera" on the television, and no woman or person other than defendant was found in the house. [430 S.W.2d at 145–146]

As they related to the search and seizure questions the trial court made the following findings:

1. On June 8, 1965, movant was residing alone in a house which he had rented located at 2104 East 59th Street, Kansas City, Jackson County, Missouri.

18 L.Ed.2d 782 (1967); Carafas v. La Vallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968); and Mancusi v. De Forte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968).

Although a state appellate court may be free to insist that it hear two, rather than one, appeal in all search and seizure cases, an entirely different question is presented as to whether it may adopt such a rule in some, but not in all cases. As stated, the latter question is not presented in this case but it will undoubtedly be presented in some future case unless mooted by a change in the present apparently ambivalent Missouri appellate practice.

2. Movant had possession and con-- into the bedroom *where he saw nar-* basement and upstairs or attic area.

3. On June 8, 1965, at about 2:30, Det. Sgt. Charles B. McKinnie of the Kansas City, Missouri Police Department met an informant, whom he knew from past experience to be reliable, who told him that narcotics from a recent drugstore burglary would be found in a house occupied by movant at 2104 East 59th Street.

4. Det. McKinnie, together with Det. John F. Russell and Ptl. Spencer Coffey, went to above address at or about 3:00 p. m. on June 8, 1965.

5. Det. McKinnie, in the presence of Det. Russell, arrested movant for burglary and for possession of narcotics, when he answered the door in response to the police officer's knock.

6. The unusual circumstance of having heard a woman scream at a time when the police officers were still outside caused Det. McKinnie to glance trol of the entire house, including its *cotics on a chair.*

7. A search of the house revealed the presence of narcotics in a cereal box in the basement.

8. Movant was not struck or threatened by the police officers during the search. (Emphasis ours.) [Tr. 95–96, No. 53,250].

The Supreme Court of Missouri obviously did not accept the emphasized portion of paragraph 6 of the trial court's finding that Detective McKinnie "saw narcotics on a chair" after he had removed a screen from a window and put his head inside the house immediately prior to the arrest of the defendant.

Under principles fully stated in Noble v. Swenson, (W.D.Mo.1968) 285 F.Supp. 385, we find that the Supreme Court of Missouri, in the exercise of its declared power of *de novo* review, reliably found the facts as they are stated in its opinion. We also defer to the Supreme Court of Missouri's determination that the trial court's finding that Detective McKinnie actually "saw narcotics on a chair" before petitioner was arrested should not be accepted. We agree with the implicit determination of the Supreme Court of Missouri that such a finding was not supported by any evidence in the record.[2]

 Applicable federal standards command that evidence seized in a citizen's home as a result of a warrantless search must be excluded in the trial of a criminal case unless the search was in fact incident to a lawful arrest. And an arrest can not be said to be lawful unless, under the particular factual circumstances, it may be said that the arresting officer had probable cause to arrest the defendant. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), is the leading case governing criminal trials in the federal courts; Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), is the leading case governing criminal trials in the state courts.

Proper application of the standards articulated in those cases and their progeny require a much more detailed examination of the particular facts involved than that accorded by the Supreme Court of Missouri. The relevant facts which control the disposition of this case are undisputed.

As a point of beginning, we defer to the Supreme Court of Missouri's finding that Detective McKinnie in fact accepted and acted solely on the word of an unnamed informer who told him that petitioner "was the person who committed a recent burglary [and] that defendant and narcotics which had been taken in that burglary, and possibly other narcotics, were in a house at 2104 East 59th Street"

2. We have set forth in Appendix A all of Detective McKinnie's testimony in regard to whether he "saw narcotics on a chair" through the window before petitioner's arrest. That testimony clearly establishes that the Supreme Court of Missouri appropriately refused to accept that portion of the trial court's finding No. 6.

(430 S.W.2d at 145). We accept the Supreme Court of Missouri's findings that Detective McKinnie (a) "knew the defendant, and * * * his reputation as a burglar and a narcotics user;" (b) that he also "knew the robbery referred to had occurred;" and (c) that "he had known his informant for 18 to 20 years, he knew him to be reliable, and he had many times received accurate information from him". (Ibid). The Supreme Court of Missouri summarized its full factual findings by stating:

> In this case Sergeant McKinnie knew defendant's reputation as a burglar and a narcotics user. He knew that a pharmacy had recently been burglarized and narcotics had been taken. The informant had been well known to Sergeant McKinnie for many years, and he had on numerous occasions supplied accurate and reliable information. Defendant was observed on the premises where the informant said he would be before he was placed under arrest. [430 S.W. at 146].

We accept that summary of findings of fact made by the Supreme Court of Missouri. Further deference to any factual findings made by the Missouri courts is unnecessary because no additional facts were or could have been reliably found. Detective McKinnie's testimony at the state postconviction evidentiary hearing establishes that he did not have any more information than that stated by the Supreme Court of Missouri. In regard to the extent of the information he had before he arrested petitioner and the sources of his informant's information, Detective McKinnie testified as follows:

Q. When did you first learn that Mr. White lived at 2104 East Fifty-ninth?

A. Well, if my memory serves me correctly, about two-thirty that same day. * * *

Q. * * * How did you learn that the defendant lived at 2104 East Fifty-ninth?

A. [T]he informer told me. * * *

Q. Now, how did you happen to come into contact with your informant?
* * *

A. The informer was seeking me.
* * *

Q. Now, again without at this time telling us the name of the informer, what exactly were you told?

A. I was told that the narcotics that came out of the Main Street Pharmacy at 4301 Main, possibly along with some others, would be at this address and in the possession of Charles White, and that they should be there. * * *

Q. Now, did the informant give you any information as to how he knew that the narcotics or items were there at this address?

A. Sir, a good police officer never asks an informant where he gets his information.

Q. So he * * * told you that he knew that the narcotics was there but he didn't tell you how he knew or elaborate on that, did he?

A. No. This is true.

Q. And you didn't inquire?

A. No.

Q. For instance, he didn't tell you that he had been involved in the burglary with Mr. White?

A. I don't think he would tell me that.

Q. All right. And, of course, you didn't ask him that either, I take it?

A. No.

Q. He didn't tell you, for instance, that he had just left there and seen the narcotics?

A. No.

Q. And, of course, he didn't tell you that he just left there and that he planted the narcotics in the basement?

A. He certainly didn't tell me that. [Tr. 53,250, p. 37 through 41].

The trial court refused to require disclosure of the name of the informer,

another federal question presented in this case which we need not and therefore do not reach, but it did permit inquiry into the past experience Detective McKinnie had had with his unnamed informer and what information that informer had about this particular case. In that regard he testified as follows:

Q. How long had you personally known this informant?

A. I would say roughly speaking eighteen to twenty years.

Q. How long have you been on the Kansas City Police Department?

A. I will be on twenty-one years. * * *

Q. Now, when did you first know the informant to be an informant?

A. When he turned thief.

Q. Do you know when it was that he turned thief? * * *

A. Probably for at least the last fifteen years.

Q. Throughout that fifteen years, had he from time to time given you information?

A. Yes, sir.

Q. Pertaining to—for want of a better word—thieves?

A. Right. * * *

Q. Had your informant told you specifically that there was some morphine there?

A. When an informant, as a rule, tells you that there is narcotics in a house, he doesn't use the word narcotics; he uses the slang expression, junk, or dope, or chicken powder, or whatever—so, you know—if he says junk, you can pick up; it could be a variety. * * *

Q. Now, at this point, had the informant told you that there was some stuff, junk, or whatever you want to call it, in the basement of this house?

A. No. He didn't tell me where it would be at. * * *

Q. Had your informant mentioned anything about the narcotics being in a cereal box?

A. No. * * *

Q. Now, back to the informant. We have discussed previously that informant's background. You say he had been giving you information off and on for approximately fifteen years, is that correct?

A. Well, I would say he had been giving me information off and on since I was a detective, which was I think since 1954. I had contact with him in uniform. * * *

Q. Let me ask you this. On occasions prior to this had he ever given you the same type of information that he did as against this defendant, telling you that the products of some particular burglary were at a particular place?

A. Oh, yes, yes, he had. * * *

Q. On any of the occasions, have you been given an inaccurate or bum steer by this particular informant?

A. Well, sometimes, if he was drunk, I didn't pay a lot of attention to what he was telling me because he would have hallucinations.

Q. Do you know whether or not this informant was at that time a narcotics addict?

A. Yes, he was, along with being a burglar and a holdup man and a petty thief. He was a little of everything.

Q. Do you know if he has ever been convicted?

A. Oh, yes, he has been convicted. * * *

A. Well, he ran with all the thieves, let's put it this way. * * *

Q. * * * Do you know whether or not this informant works with any other law enforcement agency? Do you know if he also does, I think they call it special employee work for the narcotics bureau?

A. No, I don't know this. I do know that on occasion an informer will work both for the police and for the government. In this case, I do not have any actual knowledge of his working, I have never been told this.

Q. Either by him or any other people; they have never told you that he works with any other agency, is that correct? In other words, you don't know one way or the other, either by rumor—

A. I told you while ago I didn't know who all he worked for. As far as I know, he worked for me. * *

Q. The information that you got from your informant was it your impression that this was his own or had somebody passed it on to him?

A. The information the informant passed to me?

Q. Yes.

A. I don't know where he acquired the information from. [Tr. 53,-250, pp. 41 through 68].

It is clear that Detective McKinnie did not believe it necessary to check where, how, or from whom his informer had received his information. Indeed, Detective McKinnie made clear that he had let his unnamed informer know that he wanted him to "get something on" the petitioner. He testified as follows in that regard:

Q. Had you ever told this particular informant that you would like to get something on this particular defendant, Mr. White?

A. At that time Charley White was running with a group of thieves. I wanted the whole bunch and I got most of them. * * *

Q. Had you told this particular informant that you would like to get any or all of this particular bunch?

A. That's right because they were tearing my district up. [Tr. 53,-250, pp. 61–62].

Of course, it was not necessary for Detective McKinnie to consult his informer to find out about the drug store burglary. He testified that he knew that the drug store burglary had occurred "a month or so" before he arrested petitioner and that he knew about it immediately after it happened because "I was familiar with what was happening in my district."

It is undisputed that the only thing that Detective McKinnie knew about petitioner's alleged connection with a month old burglary was the information he received from his informer.

Subsequent developments established that the informer's information was totally unreliable and inaccurate. Detective McKinnie testified in that regard that:

Q. Now, incidentally, just by way of interest, were these ten or fifteen bottles that were found in the cereal box traced to that burglary loss at the drug store we have talked about at 4301 Main?

A. I don't think they were. They were traced to another drug store burglary, and I can't recall where. [Tr. 53,250, p. 56].

It is undisputed that Detective McKinnie neither knew nor was he concerned about the source of his informer's information. His testimony in regard to what he did immediately after his informer reported that he had something on petitioner suggests that Detective McKinnie had little, if any, understanding of the constitutional principles applicable to lawful arrest and lawful searches and seizures. He testified as follows:

Q. * * * [W]hen the informant gave you this information, what did you next do?

A. I got me a squad of men together.

Q. And in that squad of men was Detective Russell and Officer Coffey, is that correct?

A. Yes, sir, that is the only two I could lay my hands on instantly at the time.

Q. And you then proceeded to Mr. White's premises out at 2104 East Fifty-ninth?

A. Yes, sir.[3] [Tr. 53,250, p. 42].

It is to the undisputed factual situation just stated that controlling federal standards must be applied. That such standards were not applied is discussed in the next part of this opinion.

## II.

In 1963 Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), restated the principle settled ten years earlier in Brown v. Allen, 344 U.S. 443, 506, 73 S.Ct. 397, 97 L.Ed. 469 (1953), in regard to the duty of a federal habeas corpus court in a state prisoner case, as follows:

Although the district judge may, where the state court has reliably found the relevant facts, defer to the state court's findings of fact, he may not defer to its findings of law. It is the district judge's duty to apply the applicable federal law to the state court fact findings independently. The state conclusions of law may not be given binding weight on habeas. [372 U.S. at 318, 83 S.Ct. at 760].

We have in this case, as in every other state prisoner habeas corpus decided by this Court, given full deference to the relevant facts reliably found by the courts of Missouri. We would, as we have in many other state prisoner habeas corpus cases, accept the Supreme Court of Missouri's conclusions of law if we could do so consistently with our constitutional duty.

Townsend v. Sain appropriately states that "the coequal responsibilities of state and federal judges in the administration of federal constitutional law are such that we think the district judge may, in the ordinary case in which there has been no articulation [of the constitutional standard applied], properly assume that the state trier of facts applied correct standards of federal law to the facts, in the absence of evidence, such as was present in Rogers v. Richmond, that there is reason to suspect that an incorrect standard was in fact applied" [372 U.S. at 314–315, 83 S.Ct. at 758]. In Rogers v. Richmond, 365 U.S. 534, 81 S. Ct. 735, 5 L.Ed.2d 760 (1961), it was apparent that the standard articulated by the courts of Connecticut "failed to apply the standard demanded by the Due Process Clause of the Fourteenth Amendment for determining the admissibility of a confession" [Ibid, at 540, 81 S.Ct. at 739]. The Supreme Court of the United States accordingly determined in Rogers v. Richmond that because "the state trial court misconstrued the ap-

---

3. The testimony quoted above brings to mind that portion of Mr. Justice Fortas' concurrence in Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), decided March 10, 1969, which stated: "It is a fundamental principle of our constitutional scheme that government, like the individual, is bound by the law. We do not subscribe to the totalitarian principle that the Government is the law, or that it may disregard the law even in pursuit of the lawbreaker. * * * It is disquieting when an individual policeman, through carelessness or ignorance or in response to the pressure of events, seizes a person or conducts a search without compliance with the standards prescribed by law. It is even more disturbing when law enforcement officers engage in unconstitutional conduct not because of their individual error but pursuant to a calculat-ed institutional policy and directive." [394 U.S. at 203, 89 S.Ct. at 981].

And on April 22, 1969, in Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676, the Supreme Court of the United States reiterated that "Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry." That case quoted with approval from a 1959 opinion of Chief Judge Hastie which stated that "It bears repeating that the matter of primary judicial concern in all cases of this type is the imposition of effective sanctions implementing the Fourth Amendment guarantee against illegal arrest and detention. * * * The important thing is that those administering the criminal law understand that they must do it that way." [394 U.S. at 725, 89 S.Ct. at 1397].

plicable law of the Constitution and was sustained in doing so by Connecticut's Supreme Court. * * * It was error for the court below to affirm the District Court's denial of petitioner's application for habeas corpus" [Ibid, at 548–549, 81 S.Ct. at 744].

In this case, as in Rogers v. Richmond, both the state trial and appellate courts articulated the standards which they respectively applied to the facts involved in the federal search and seizure question presented. Because standards were in fact articulated, it is our duty to determine whether the standards in fact applied were those demanded by the Fourth Amendment. Our examination of the state court proceedings forces the conclusion that a state, not a federal standard, was in fact applied and that appropriate application of the controlling federal standard requires that the writ be granted.

In regard to the search and seizure question, the state trial court concluded as a matter of law that:

2. Det. Sgt. McKinnie had probable cause, based on the informant's reliable information, to arrest movant for

burglary and for possession of narcotics on June 8, 1965.

3. The consequent search of the premises at 2104 East 59th Street, Kansas City, Jackson County, Missouri, occupied and controlled by movant was lawful, as incident to a lawful arrest. State vs. Brookshire, 353 S.W.2d 681 (Mo.1962)

It is difficult to ascertain what standard the state trial court applied because State v. Brookshire, the only case cited and relied upon, does not articulate any standard.[4] Indeed, in Brookshire, the Supreme Court of Missouri refused to reach the federal search and seizure question presented by the defendants on the merits. Brookshire noted that the defendant's motion for new trial in fact contained an assignment that "the court committed error in denying defendant's motion to suppress evidence." But the court nevertheless refused to consider that assignment on the merits on the ground that "the record before us preserves no evidence or proof offered in support of said motion and there is nothing upon which to predicate prejudicial error as the allegations in said motion do not prove themselves." [353 S.W.2d at 684].[5]

4. In Part I of this opinion we noted that the trial court found as a fact that Detective McKinnie "saw narcotics on a chair" as he looked into petitioner's home before the arrest was made. In Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), the Supreme Court of the United States noted that the federal arresting officer there involved had testified that one of the twelve cases of the liquor involved in that case "was on the front seat [and] was visible from outside the car."

By its rejection of the trial court's unsupported finding, the Supreme Court of Missouri properly determined that the legality of the search here involved could not, on the facts, be sustained on that portion of Brinegar's rationale.

5. The Supreme Court of Missouri's reliance in Brookshire on the pre-Mapp case of State v. Hepperman, 349 Mo. 681, 162 S.W.2d 878, 887 (1942), to support its determination that the allegations in a motion to suppress "do not prove them-

selves" reflects a post-Mapp reliance on pre-Mapp authority which is so clearly inconsistent with applicable federal standards that extended discussion of the point is redundant.

The 1942 opinion in Hepperman stated, at the particular point identified by the court in Brookshire, the following:

In her assignments of error, the defendant says the court erred in failing to conduct an inquiry into the merits of her motion to suppress and before ruling on it. Here again, however, we are bound by the record which sets forth the motion and then recites "the court being made fully informed and advised in the premises, doth overrule said motion to suppress evidence as offered by the defendant." * * * The motion does not prove itself. 20 Am.Jur., Sec. 396, pp. 357, 358; State v. Berry, Mo.Sup., 253 S.W. 712. In the face of the court's recital that it was fully informed and advised in the premises we must assume that the court did conduct an inquiry or that

The Supreme Court of Missouri articulated the standard it applied more fully than did the trial court. Although apparently reluctant to do so (see that court's citation of the pre-*Mapp* case of State v. Lord, (Mo.Sup.Ct., Div. 2, 1956) 286 S.W.2d 737, which, in reliance upon the rule of *Hepperman* discussed in footnote 5, refused to reach the merits of a search and seizure question) the Supreme Court of Missouri did decide, on the merits, the federal search and seizure question it initially avoided when it affirmed petitioner's conviction on direct appeal. After stating "whether there was probable cause for the arrest of defendant depends upon whether there existed reasonable grounds for the arresting officer to believe an offense had been committed by defendant," the Supreme Court of Missouri stated:

> Probable cause for making an arrest is incapable of exact definition beyond saying that "the officer must not act arbitrarily, must exercise his discretion in a legal manner, must use all reasonable means to prevent mistakes and must be actuated by such motives as would influence a reasonable man acting in good faith." State v. Jefferson, Mo., 391 S.W.2d 885. As stated in Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879, in the determination of probable cause for an arrest without a warrant, "we deal with probabilities" which are "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." [430 S.W.2d at 146.]

Under the command of Townsend v. Sain the question presented is whether the Supreme Court of Missouri articulated and applied appropriate federal probable cause standards to the undisputed factual situation presented by this case.

The first sentence of the Supreme Court of Missouri's articulation of the standard applicable to this case quoted but a portion of a sentence from State v. Jefferson, (Mo.Sup.Ct., Div. 2, 1965) 391 S.W.2d 885. The sentence from which that quotation was taken commenced with the words: "What constitutes reasonable grounds to believe that an offense has been committed by the person arrested is incapable of an exact definition beyond saying that * * *." That *portion* of the *Jefferson* sentence was not quoted in the Supreme Court of Missouri in the pending case. Only the remainder of the sentence was quoted. That remainder, of course, was but a paraphrase of a state standard articulated in the pre-*Mapp* case of State v. Cantrell, (Mo.Sup.Ct., Div. 2, 1958) 310 S.W.2d 866. The *Cantrell* case, as will be fully developed later, has been recently expressly rejected by the Supreme Court of Missouri as not being in accord with current federal standards.

It should be noted at this point, however, that what was said in *Jefferson* about the Supreme Court of Missouri's inability to state an exact definition did not relate to any effort on its part to define "probable cause." The effort in *Jefferson* related to the entirely different question of whether, under a pre-*Mapp* state standard, an arresting offi-

the defendant offered no evidence in support of her motion, otherwise she would have preserved it in this record and it could then be determined whether the court erroneously overruled the motion. [emphasis ours.] [162 S.W.2d at 887.]

We know of no court which would today entertain the notion that it can avoid consideration of the merits of a federal search and seizure question on the ground that appropriate inquiry need not be made into the accuracy of the

record proper or the court reporter's transcript of the trial proceedings. A rule of appellate practice which would today apply such a practice in some, but not all, cases would present a Fourteenth Amendment question similar to that noted in footnote 1. Such a question, of course, is not presented in this case, and, like the question discussed in footnote 1, may be mooted by an appropriate change in Missouri appellate practice before this Court is required to reach it.

cer had "reasonable grounds to believe that an offense has been committed by the person arrested."

It is obvious that difficulties encountered in attempting to define what "constitutes reasonable grounds to believe that an offense has been committed," as stated in *Jefferson,* does not appropriately state the question of whether an arresting officer, under applicable federal standards, may be said to have had "probable cause" to make a warrantless arrest. It should be quite apparent that an arresting officer might have had grounds for "reasonable suspicion" to believe that an offense had been committed, as articulated as a part of the now rejected pre-*Mapp* state standard stated in State v. Cantrell (upon which *Jefferson* was based) without in any way having the requisite "probable cause" as enunciated in long standing federal standards.

We have noted, of course, that the Supreme Court of Missouri quoted a portion of a sentence from Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). We discuss that case in detail later in this opinion. Detailed discussion of McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), and the annotation cited in 3 L.Ed.2d 1736, is impossible because we have no way of knowing what particular portion of those authorities the Supreme Court of Missouri believed were consistent with its second reliance upon State v. Jefferson, which was included in the "see also" citation.

We find and determine, however, that the articulation of federal standards in *McCray* and *Ker* are not consistent with the state search and seizure standard articulated in this case or in State v. Jefferson, upon which this case is primarily based. Simply stated, both *McCray* and *Ker*, on the particular facts and circumstances presented in both cases, were held to fall on the same side of the line as Draper v. United States,

358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Indeed, *McCray* specifically added that the factual situation there presented was unlike that presented in Beck v. Ohio. See 386 U.S. at 304, 87 S.Ct. 1056. It is important therefore that detailed discussion be given State v. Jefferson.

It should be noted at the outset of our discussion of State v. Jefferson that the Supreme Court of Missouri's reliance upon language from that case reflects an exceptional deviation from one of the most outstanding records of any state court in the United States of long and vigilant judicial protection of state and federal constitutional guarantees against unlawful searches and seizures. It would, however, be judicially naive to suggest that *Jefferson* and this case, which is based on *Jefferson,* are the only two cases decided by the Supreme Court of Missouri since *Mapp* which are inconsistent with the traditional view most frequently articulated by the Supreme Court of Missouri over the years in regard to unlawful searches and seizures.

Recognition of the juridical fact that there are two quite distinct lines of Missouri search and seizure jurisprudence should not obscure the equally obvious fact that the line of authority which continues to articulate and apply pre-*Mapp* state standards, of which Jefferson and this case are examples, is apparently being expressly repudiated by the Supreme Court of Missouri as that court again becomes acclimated to the application of current federal standards.

In order that the relative strength of the two lines of Missouri post-*Mapp* authority be kept in appropriate perspective we begin with what this Court said en banc in 1966. In White v. Swenson, (W.D.Mo. en banc 1966) 261 F.Supp. 42, 51, we noted that in 1924 the Supreme Court of Missouri expressly adopted and followed the rule articulated in *Weeks* in its en banc opinion in State v. Owens, Mo.Sup.Ct. en banc 1924) 302 Mo. 348, 259 S.W. 100, 32 A.L.R. 383.[6]

6. Judge White's opinion in State v. Owens is one of the leading pre-*Mapp* state

search and seizure cases. That opinion carefully analyzed and considered the

That determination of judicial policy was made by the Supreme Court of Missouri in 1924 with the full recognition that the Fourteenth Amendment had not yet been construed by the Supreme Court of the United States to require states to apply the Fourth Amendment to searches and seizures made by state officers. See 259 S.W. at 101.

But voluntary adoption in 1924 of what could then be appropriately called "the federal rule" did not guarantee that independent development of Missouri search and seizure rules of decision would automatically parallel and keep pace with Supreme Court of the United States Fourth Amendment decisions from that time to the present. Study of the Missouri search and seizure cases decided since 1924 establishes that, as time went on, the Supreme Court of the United States decisions were less frequently cited or discussed by the Supreme Court of Missouri. Missouri obviously built a body of state search and seizure law which developed quite independently of current decisions of the Supreme Court of the United States. And the tendency of some of the Missouri cases to disregard standards articulated by the Supreme Court of the United States in favor of independently developed state standards became more apparent after the decision of Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). Wolf v. Colorado, of course, temporarily freed state courts from any federal constitutional duty to apply federal standards to search and seizure cases.[7]

In the twelve year interval between Wolf v. Colorado and the express overruling of that case in 1961 by *Mapp*, the Supreme Court of Missouri not infrequently stated that the reason it was applying a state search and seizure standard in preference to the federal standard was that it was not constitutionally bound to follow the Supreme Court of the United States in search and seizure cases. See, for example, State v. Cantrell, (Sup.Ct. of Mo., Div. 2, 1958) 310 S.W.2d 866, 868, which stated that "The Fourth Amendment to the Constitution of the United States applies only to the federal government, its officers and agents [and therefore] has no application to the facts of this case, involving, as it does, state officers only." For another example, see City of St. Louis v. Evans, (Sup.Ct. of Mo., Div. 1, 1960) 337 S.W.2d 948, 957, in which it was stated that "the 4th Amendment to the Constitution of the United States prohibiting unreasonable searches and seizures applies only to the Federal government."

leading Supreme Court of the United States cases of Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); Adams v. New York, 192 U.S. 585, 24 S.Ct. 372, 48 L.Ed. 575 (1904); Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921); Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921); Burdeau v. McDowell, 256 U.S. 465, 41 S. Ct. 574, 65 L.Ed. 1048 (1921); and Essgee Co. of China v. United States, 262 U.S. 151, 43 S.Ct. 514, 67 L.Ed. 917 (1923). That case determined that the rule of the Supreme Court of the United States should be followed in the trial of state criminal cases, "not merely because the United States Supreme Court is the highest authority, but for other reasons: The federal rule is the result of years of mature consideration, during which the question at issue was before the federal courts under varying circumstances of fact, so that it has been tested and applied to nearly all conceivable conditions. Section 11, art. 2, of our Constitution is almost identical in language and exactly identical in purport with Amendment No. 4 to the federal Constitution." [259 S. W. 106].

7. Considerations discussed elsewhere may have also played a part in the general tendency of the Supreme Court of Missouri to cite and rely on its own, rather than Supreme Court of the United States, decisions. See Appendix A–A Brief Summary of the Constitutional History that Preceded the 1963 [State Prisoner Habeas Corpus] Trilogy—attached to Postconviction Applications Viewed by a Federal Judge—Revisited, 45 F.R.D. 199 at 221.

A declaration that the Fourth Amendment applied only to federal and not state officers, of course, was an implicit recognition that some standard other than that articulated in cases applying "the federal rule" adopted by the Supreme Court of Missouri en banc in 1924 was being applied in the particular case which then pended before the Supreme Court of Missouri. It is obvious therefore that state, rather than federal, standards were knowingly applied in particular pre-*Mapp* decisions of the Supreme Court of Missouri. Such decisions were, of course, then consistent with the Law of the Land, as stated in Wolf v. Colorado.

After *Mapp* was decided in 1961, however, every court bound by the Constitution of the United States, including the Supreme Court of Missouri, was, by reason of the Supremacy Clause in Article VI of the Constitution, under mandatory duty to apply federal Fourth Amendment standards as articulated by the Supreme Court of the United States to all searches and seizures made by either a state or federal officer.

Many Missouri cases since *Mapp* have clearly articulated and appropriately applied current federal Fourth Amendment standards to particular search and seizure cases. See, for example State v. Edmondson, (Sup.Ct. of Mo., Div. 1, 1964) 379 S.W.2d 486, in which only Supreme Court of the United States cases were cited and relied upon. See also State v. Young, (Sup.Ct. of Mo., Div. 1, 1968) 425 S.W.2d 177, in which Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L. Ed.2d 134 (1959), and *Mapp*, rather than pre-*Mapp* Missouri cases, were appropriately cited and applied.

And see more particularly, the most significant recent case of State v. Seymour, (Sup.Ct. of Mo., Div. 1, 1969) 438 S.W.2d 161, in which the standards articulated in Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) were stated and applied.

*Seymour* appropriately recognized that "federal constitutionally protected rights are involved and determination of the validity of the arrest must be made in the light of the standards imposed for the protection of such rights." [438 S. W.2d at 162].

Consistent with the tradition which voluntarily adopted the federal rule in 1924, and with the present mandatory command of *Mapp*, the Supreme Court of Missouri stated in *Seymour* that:

> The language of some earlier cases in this court which would bolster the validity of an arrest by the fact that the defendant was ultimately convicted (e. g. State v. Berstein, Mo.Sup., 372 S.W.2d 57, 59; State v. Cantrell, Mo.Sup., 310 S.W.2d 866, 869–870; State v. Williams, 328 Mo. 627, 14 S.W. 2d 434) is not in accord with the standards prescribed by Beck v. Ohio, *supra*, which standards must prevail. [Id. at 163].

Prior acceptance by the Supreme Court of Missouri of the state standards articulated in the three cases expressly rejected in *Seymour* illustrates that in spite of the 1924 adoption of the federal rule by the Supreme Court of Missouri en banc, a limited number of subsequent divisional opinions of the Supreme Court of Missouri nevertheless implicitly, and sometimes expressly, rejected the established federal standard in favor of a different state standard based entirely on state court decisions.

While two of the cases expressly rejected by *Seymour* were pre-*Mapp* cases, the third case, like *Jefferson* and the present case, was a post-*Mapp* case which nevertheless applied a pre-*Mapp* state standard. Examination of State v. Berstein, the post-*Mapp* case rejected in *Seymour*, illustrates how some of the post-*Mapp* Missouri cases continued to place reliance on and follow earlier pre-*Mapp* Missouri cases which articulated and applied state, rather than federal, standards.[8]

---

8. State v. Cantrell and State v. Williams, the other two cases expressly rejected by

*Seymour*, were both pre-*Mapp* cases. At the time both those cases were decided

State v. Berstein was decided in 1963; two years after *Mapp* had been decided. The opinion in *Berstein*, however, shows that neither *Mapp* nor any other federal decision was cited; the Supreme Court of Missouri simply articulated and applied a state standard which it had independently developed in pre-*Mapp* days. Under that state standard a Missouri police officer was given authority "to arrest any person upon suspicion who is in fact guilty of a recent felony, whether the officer be advised of such felony or not." That state standard, independently developed in Missouri, was, as recognized in *Seymour*, contrary to all federal cases from the time Boyd v. United States was decided by the Supreme Court of the United States in 1886.

*Seymour* was obviously right when it determined that such a rule was not in accord with the controlling federal standard and that neither the post-*Mapp* case of *Berstein* nor the pre-*Mapp* Missouri cases upon which it was based could any longer be said to reflect the appropriate standard to be applied in the trial of a criminal case in Missouri.

The Supreme Court of Missouri's opinion in the pending case followed the same pattern as that followed in *Berstein*. It did not look to Supreme Court of the United States decisions for the applicable standard of probable cause. Rather, the Supreme Court of Missouri ruled the

pending case on the theory that "probable cause for making an arrest is incapable of exact definition" beyond application of a state standard which it quoted directly from State v. Jefferson.

While *Jefferson*, as *Berstein*, was decided after *Mapp*, it is clear that *Jefferson*, like *Berstein*, in fact articulated and applied a state standard which had been established in earlier pre-*Mapp* Missouri cases quite independent of United States Supreme Court decisions. Indeed, debate about the state oriented rationale of *Jefferson* is foreclosed by that case's express reliance upon *Cantrell*, one of two pre-*Mapp* cases expressly rejected by *Seymour*.

In *Jefferson* it was significantly noted that "both sides have referred us to numerous federal decisions bearing on the question * * * [of] whether the arrest was lawful." [391 S.W.2d at 888.] The Supreme Court of Missouri, however, refused either to cite or discuss the federal decisions to which both sides directed its attention, stating that "we have examined all of them but find it unnecessary to review them in the opinion since the Missouri and federal constitutional standards are not inconsistent." [9]

The fact that *Jefferson* was based on state, rather than federal, standards is further established by the fact that any future vitality of that portion of

---

there was no reason (except the 1924 adoption of "the federal rule" which the Supreme Court of Missouri en banc was at liberty to change if it so desired) for either of those cases to articulate and apply anything other than a state standard to a search and seizure case.

9. A limited number of other post-Mapp divisional opinions of the Supreme Court of Missouri have refused to cite or discuss the currently applicable federal standards for reasons similar to those stated in *Jefferson*. In State v. Howe, (Sup.Ct.Mo., Div. 1, 1963) 364 S.W.2d 546, 547, for example, the court dismissed the argument that *Mapp* had an impact on whether the Supreme Court of Missouri any longer had a choice between state and federal standards with the rather curt statement that the "rule [of *Mapp*] has been follow-

ed in Missouri, for many years and long before the *Mapp* case was decided." For another example, see State v. Spica, (Sup. Ct. of Mo., Div. 2, 1965) 389 S.W.2d 35, 43, in which a similar argument based on *Mapp* was rejected by the statement that "it has long been the rule in Missouri that evidence obtained by an unreasonable search and seizure is not admissible in a criminal case."

As we have emphasized, post-*Mapp* cases such as *Howe*, *Spica*, *Jefferson* and this case, in which articulation and application of appropriate federal standards is avoided by reliance on the notion that state standards have kept pace with federal standards since 1924, represent the exceptional and not the usual rationale applied by the Supreme Court of Missouri to most of the post-*Mapp* search and seizure cases decided by that court.

*Jefferson* which related to a defendant's "standing" was vitiated by State v. Ross, (Sup.Ct.Mo., Div. 1, 1969) 438 S.W.2d 8. *Ross,* unlike *Jefferson,* gave appropriate recognition to principles articulated and applied in Jones v. United States, 362 U. S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), rejected state standards to the contrary, and properly applied federal standards to the factual circumstances of that case. Jones v. United States had been on the books five years when *Jefferson* was decided.

The out of context quotation of language from Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) by the Supreme Court of Missouri in the present case adds little to that court's articulation of the appropriate federal constitutional standard applicable to this case. Indeed, the citation of *Brinegar* could well be said further to illustrate the Supreme Court of Missouri's preference for its own state standard over the controlling federal standard.

The question presented in *Brinegar* was whether a particular factual situation involving a warrantless highway search of an automobile thought to be transporting intoxicating liquor illegally was factually distinguishable from Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), decided almost a quarter of a century earlier. *Brinegar* made clear that "no problem of searching the home or any other place of privacy was presented either in *Carroll* or here" [338 U.S. at 176, 69 S.Ct. at 1311]. *Brinegar* did, however, in its discussion of standards applicable to highway searches of automobiles, fully discuss the probable cause standard applicable to the lawful search of a home. That case stated that the substance of all definitions of probable cause "is a reasonable ground for belief of guilt" and that "this 'means less than evidence which would justify condemnation' or conviction, as Marshall, C. J., said for the Court more than a century

ago in Locke v. United States, 7 Cranch 339, 348, 3 L.Ed. 364" [338 U.S. at 175, 69 S.Ct. at 1310].

Mr. Justice Rutledge added:

Since Marshall's time, at any rate, it [probable cause] has come to mean more than bare suspicion: Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162, [45 S.Ct. 280, 288, 69 L.Ed. 543] [338 U.S. at 175–176, 69 S.Ct. at 1310].

In *Brinegar* the Supreme Court of the United States explained why the federal standard for appropriate measurement of probable cause had remained constant since the time of Chief Justice John Marshall:

These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. [Ibid].

Mr. Justice White recently stated the following in Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 221, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968), in which the Supreme Court of Tennessee was reversed for failure to apply federal search and seizure standards:

Automobiles, because of their mobility, may be searched without a warrant upon facts not justifying a warrantless search of a residence or office. Brinegar v. United States, 338 U.S. 160 [69 S.Ct. 1302, 93 L.Ed. 1879] (1949); Carroll v. United States, 267 U.S. 132 [45 S.Ct. 280, 69 L.Ed. 543] (1925). The cases so holding have, however, always insisted that the officers conducting the search have "rea-

sonable or probable cause" to believe that they will find the instrumentality of a crime or evidence pertaining to a crime before they begin their warrantless search. [391 U.S. at 221, 88 S. Ct. at 1475].

The Supreme Court of Missouri's refusal to recognize that the standards applicable to the search of automobiles on the highway are less stringent than those applicable to the search of a home, a principle expressly stated both in *Brinegar* and most recently reiterated in *Dyke* suggests that the out of context quotation from *Brinegar* was an attempt to justify a state standard less stringent than even the automobile cases. The choice of the particular quotation from *Brinegar* also suggests agreement with the notion that recognition of Fourth Amendment rights is to be considered, at best, as something of a legal technicality.

Mr. Justice Jackson's often quoted dissent in *Brinegar* is the complete answer to such a suggestion. After stating that "indications are not wanting that Fourth Amendment freedoms are tacitly marked as secondary rights, to be relegated to a deferred position," Mr. Justice Jackson quoted the Fourth Amendment in full and then stated:

These, I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police. [338 U.S. at 180–181, 69 S.Ct. at 1313].

As one who had the benefit of experience as Attorney General of the United States, he added:

We must remember that the extent of any privilege of search and seizure without warrant which we sustain, the officers interpret and apply themselves and will push to the limit. We must remember, too, that freedom from unreasonable search differs from some of the other rights of the Constitution in that there is no way in which the innocent citizen can invoke advance protection. * * * [A]n illegal search and seizure usually is a single incident, perpetrated by surprise, conducted in haste, kept purposely beyond the court's supervision and limited only by the judgment and moderation of officers whose own interests and records are often at stake in the search. There is no opportunity for injunction or appeal to disinterested intervention. The citizen's choice is quietly to submit to whatever the officers undertake or to resist at risk of arrest or immediate violence.

And we must remember that the authority which we concede to conduct searches and seizures without warrant may be exercised by the most unfit and ruthless officers as well as by the fit and responsible, and resorted to in case of petty misdemeanors as well as in the case of the gravest felonies. [Id. at 182, 69 S.Ct. at 1314].

The Supreme Court of Missouri's treatment of *Brinegar* does not establish that federal, rather than state, standards were applied.

■ We find and determine that the standard of probable cause articulated and applied by the Supreme Court of Missouri in the pending case did not appropriately articulate the controlling federal standard applicable to the undisputed factual situation presented in this case. We further find and determine

that the standard articulated and applied by the Supreme Court of Missouri in this case was a state standard and that such state standard was in fact and law inconsistent with the applicable Fourth Amendment standard established by controlling decisions of the Supreme Court of the United States.

Under Townsend v. Sain we are therefore required to apply the applicable federal standard in the next part of this opinion.

### III

Had the Supreme Court of Missouri applied the probable cause standard articulated in Beck v. Ohio to the factual situation here presented, as it did in its recent opinion in the Seymour case, this case would not now be before this Court. Acceptance of the facts found by the courts of Missouri and a fair reading of all the evidence establishes that Detective McKinnie arrested petitioner on the sole basis of what he deemed was petitioner's reputation and an informer's tip. The informer's tip involved in this case was uncorroborated either as to the source from which the informer received his information or by any other internal or external circumstance.

In Beck v. Ohio, supra, Mr. Justice Stewart pointed out that "all that the trial court was told in this case was that the officers knew what the petitioner looked like and knew that he had a previous record of arrests or convictions for violations of the clearing house law." [379 U.S. 96–97, 85 S.Ct. 228]. The court made reference to the testimony of the arresting officer given at the motion to suppress, stating:

> As to the officer's own knowledge of the petitioner before the arrest, the record shows no more than that the officer "had a police picture of him and knew what he looked like," and that the officer knew that the petitioner had "a record in connection with clearing house and scheme of chance."

Beyond that, the officer testified only that he had "information" that he had "heard reports," that "someone specifically did relate that information," and that he "knew who that person was." [Id. at 93–94, 85 S.Ct. at 226].

■ Beck v. Ohio, supra, stated that "the constitutional validity of the [warrantless] search in this case * * * must depend upon the constitutional validity of the petitioner's arrest." It stated the controlling applicable standard as follows:

> Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense. Brinegar v. United States, 338 U.S. 160, 176–176, 69 S.Ct. 1302; 1310–1311, 93 L.Ed. 1979]; Henry v. United States, 361 U.S. 98, 102 [80 S.Ct. 168, 171, 4 L.Ed.2d 134]. [Id. at 91, 85 S.Ct. at 225].

The state court conviction was reversed because of insufficiency of evidence to support a finding of probable cause. The court stated:

> We may assume that the officers acted in good faith in arresting the petitioner. But "good faith on the part of the arresting officers is not enough." Henry v. United States, 361 U.S. 98, 102 [80 S.Ct. 168, 171, 4 L.Ed. 2d 134]. If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects," only in the discretion of the police. [Id. at 97, 85 S.Ct. at 229].

■ The principle that a lawful arrest and subsequent search and seizure cannot be based solely on the uncorroborated

word of an informer has never been questioned in any Supreme Court of the United States case since Weeks v. United States, *supra*, was decided well over fifty-five years ago.[10]

Mr. Justice Harlan most recently stated in Spinelli v. United States, 393 U.S. 410, 417, 89 S.Ct. 584, 589, 21 L.Ed. 2d 637 (1969) that "the analysis required for an answer to * * * the question whether the police had probable cause for an arrest without a warrant * * * is basically similar to that demanded of a magistrate when he considers whether a search warrant should issue." It is therefore apparent that cases involving the legal sufficiency of statements set forth in applications for search warrants are apposite to this case. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), was such a case in which a factual situation most comparable to the facts in this case was presented.

In *Aguilar* two police officers presented to a state Justice of the Peace an affidavit to obtain a warrant to search for narcotics in the defendant's home. That affidavit, which duplicated the substance of Detective McKinnie's testimony in this case, stated no more than that "affiants have received reliable information from a credible person and do believe that heroin, marijuana, barbituates and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law." The court held that "the search warrant should not have been issued because the affidavit did not provide a sufficient basis for a finding of probable cause and that the evidence obtained as a result of the search warrant was inadmissible in petitioner's trial" [378 U.S. at 115–116, 84 S.Ct. at 1514].

*Aguilar* stated with particularity that "the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant * * * was 'credible' or his information 'reliable.'" [378 U.S. at 114, 84 S.Ct. at 1514].

Mr. Justice Harlan discussed Aguilar's standard in Spinelli v. United States, *supra*, noting that the standard controlling a finding of probable cause is based on a "two-pronged test." He stated:

In *Aguilar*, * * * this Court held the affidavit inadequate for two reasons. First, the application failed to set forth any of the "underlying circumstances" necessary to enable the magistrate independently to judge of the validity of the informant's conclusion that the narcotics were where he said they were. Second, the affiant-officers did not attempt to support their claim that their informant was "'credible' or his information 'reliable.'" [393 U.S. at 412–413, 89 S.Ct. at 587].

■ The Court emphasized in *Spinelli* that "the informant's tip, has a fundamental place in this warrant application," adding that "without it, probable cause could not be established" [393 U.S. at 414, 89 S.Ct. at 588].[11] The same thing

10. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), is sometimes improperly cited as an example to the contrary. That case is a good illustration of how close a particular search and seizure case can get on its particular facts. *Draper* actually decided that *"under the facts and circumstances here,* Marsh [the federal arresting officer] had probable cause and reasonable grounds to believe that petitioner was committing a violation of the laws of the United States relating to narcotic drugs at the time he arrested him." [Id. at 314, 79 S.Ct. at 333] [emphasis ours]. *Draper* has never been extended beyond the facts and circumstances there present in that case.

11. The application for the search warrant in *Spinelli* stated that the FBI "has been informed by a confidential reliable informant that William Spinelli is operating a handbook and accepting wagers" [393

is obviously true in this case because the only things that Detective McKinnie knew, independent of the informer's tip, as emphasized by the Supreme Court of Missouri, were the "defendant's reputation as a burglar and a narcotics user" and the fact that "a pharmacy had recently been burglarized and narcotics had been taken" [430 S.W.2d at 146]. Those facts plus an arresting officer's good faith belief in the reliability of his informer, simply are not sufficient to support a finding of probable cause.[12] The fact that Detective McKinnie knew as a matter of police routine that a drug store had been burglarized in his district approximately a month before he arrested petitioner did not establish probable cause for him to make warrantless arrests solely on the basis of an informer's tip of any and all persons within his district whose reputations he considered to be bad.

The fact that Detective McKinnie "knew defendant's reputation as a burglar and a narcotics user" cannot be said to have established probable cause for petitioner's arrest. *Spinelli* put such data in appropriate perspective when it determined that "the allegation that Spinelli was 'known' to the affiant and to other federal and local law enforcement officers as a gambler and an associate of gamblers is but a bald and unilluminating assertion of suspicion that is entitled to no weight in appraising the magistrate's decision" [393 U.S. at 414, 89 S.Ct. at 588].[13]

The informer's tip in this case was even more uninformative than that involved in *Spinelli*. It was uncorroborated to any extent. *Spinelli* pointed out that (a) "though the affiant swore that his confidant was 'reliable,' he offered the magistrate no reason in support of this conclusion," (b) "the tip does not contain a sufficient statement of the underlying circumstances from which the informer concluded that Spinelli was running a bookmaking operation;" and (c) "we are not told how the FBI's source received his information—it is not alleged that the informant personally observed Spinelli at work or that he had ever placed a bet with him. Moreover, if the informant came by the information indirectly, he did not explain why his sources were reliable" [393 U.S. at 416, 89 S.Ct. at 589]. Mr. Justice Harlan added:

In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail so that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation. [393 U.S. at 416, 89 S.Ct. at 589].

U.S. at 414, 89 S.Ct. at 588]. Acceptance of the finding that Detective McKinnie thought his informer was reliable, standing alone, does not establish probable cause.

12. Beck v. Ohio, *supra*, enunciated the controlling principle applicable to an arresting officer's good faith reliance upon the reliability of his informer when it stated that:

We may assume that the officers acted in good faith in arresting the petitioner. But "good faith on the part of the arresting officers is not enough." Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 171.

13. Mr. Justice Harlan relied upon the 1933 decision of Mr. Justice McReynolds in

Nathanson v. United States, 290 U.S. 41, 46, 54 S.Ct. 11, 78 L.Ed. 159 (1933), in which a court, not generally considered to be particularly radical, unanimously held a search warrant void because "it went upon a mere affirmation of suspicion and belief without any statement of adequate supporting facts." [290 U.S. at 46, 54 S.Ct. at 13]. Mr. Justice McReynolds anticipated Mr. Justice Harlan's opinion in *Spinelli* by thirty years when he held in *Nathanson* that "Under the Fourth Amendment, an officer may not properly issue a warrant to search a private dwelling unless he can find probable cause therefor from facts or circumstances presented to him under oath or affirmation" [290 U.S. at 47, 54 S.Ct. at 13].

Application of the standards stated require that we find and determine under the undisputed factual circumstances that petitioner's arrest was not based on probable cause, that the subsequent search was not the incident of a lawful arrest, and that the evidence seized was not admissible in evidence at his trial. The admission of that evidence violated petitioner's rights as guaranteed by the Fourth and Fourteenth Amendments to the Constitution. His conviction must therefore be adjudged void.

### IV

The question of remedy remains. This case is unique in that petitioner was released from the Missouri Penitentiary on parole while proceedings in this Court were pending. Petitioner elected to proced in spite of the advice of counsel that if the writ is granted petitioner could and may be retried on the original charge. His right to have this case adjudicated is established under principles stated in Carafas v. La Vallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968).

Accordingly, and for the reasons stated, petitioner is entitled to the relief sought in his petition. In accordance with the policy considerations implicit in this Court's order in Jedby v. Swenson, (W.D.Mo.1966) 261 F.Supp. 209, 214, it is

Ordered that petitioner's petition for habeas corpus should be and is hereby granted. It is further

Ordered that issuance and execution of the writ be stayed for a period of thirty (30) days from the date of this order within which time the State of Missouri, acting through its Attorney General, may make appropriate application to the Supreme Court of Missouri to have that court (a) vacate and set aside its original affirmance of petitioner's conviction on direct appeal, reported in 408 S.W.2d 31, and (b) vacate and set aside its affirmance of the trial court's denial of his Missouri Rule 27.26 motion, reported in 430 S.W.2d 144, and (c) to set aside and vacate petitioner's conviction, all to the

end that the State of Missouri may thereafter be afforded the opportunity to commence new trial proceedings against petitioner. It is further

Ordered that if the Supreme Court of Missouri does not appropriately declare petitioner's conviction to be invalid and if no new trial proceedings are thereafter commenced within the thirty (30) day stay period, the writ shall issue and be executed forthwith. It is further

Ordered that if appropriate new trial proceedings are commenced, consistent with the stay order within the thirty (30) day stay period, issuance and execution of the writ shall be further stayed until further order of this Court. It is further

Ordered that the Attorney General of Missouri shall keep this Court advised by the filing of appropriate reports of any and all action which may be taken by the State of Missouri consistent with this Court's stay of issuance and execution of the writ. A report shall in any event be filed by the Attorney General on or before the expiration of the thirty (30) day stay period.

### APPENDIX A

DETECTIVE McKINNIE'S TESTIMONY IN REGARD TO WHETHER HE "SAW NARCOTICS ON A CHAIR" AS HE LOOKED THROUGH THE WINDOW PRIOR TO PETITIONER'S ARREST.

At the hearing on the motion to suppress held the day before trial, Detective McKinnie testified as follows:

Q. What did you do when you arrived at 2104 East Fifty-ninth Street?

A. Well, Detective Russell, as I recall started to knock on the door and at the same time I heard a woman screaming for help, saying "Stop, you are hurting me, you are hurting my arm." The window to the left of the porch was open, the screen was hanging loosely, and the lace curtain or the curtain or drape was hanging there. I thought that there was a woman

who had—was being harmed. I pulled—lifted the screen off, pulled the curtain aside. At the same time Detective Russell knocked on the door and I observed White standing there in his shorts with a large roll of money in his hand.

Q. Do you know who opened the door of the house?

A. White.

Q. Was there a knock at the door first?

A. Yes.

Q. And who knocked on the door?

A. Detective Russell, as I recall.

Q. What happened then?

A. White came to the door. In the meantime I pulled my head back out of the window there and went in to the door and I told White that he was under arrest in connection with a burglary of the Main Street Pharmacy. I had information that there was narcotics there, would he give them to me, or did he want me to search for them.

Q. What was the time sequence between the time the door was opened and the time you made this statement that he was under arrest?

A. Oh, it was just almost simultaneously. The door was open and he approached it. * * *

Q. Was this search made incident to the arrest on the charge of burglary?

A. In my opinion, yes, sir. * * *

THE COURT: Now, I did not understand about the [narcotic] paraphernalia you described. Did you see that through the window or did you—

THE WITNESS: No, Your Honor, after hearing this woman screaming when he let us in to the front —* * * I managed, after hearing this screaming woman I managed to maneuver my way in

such a way, the door was open, to glance in to that room to see if there was any other person in this house, mostly for self protection. That's when I noticed the paraphernalia laying there on the chair next to the bed.

THE COURT: You were already in the house when you saw that?

THE WITNESS: Oh, yes. * * *

At the trial next day, Detective McKinnie testified as follows:

Q. Now, what exactly happened when you arrived at the residence, Officer?

A. We knocked on the door, the door was opened by Charles White, the defendant. He was informed at this time that he was under arrest in connection—

Q. What happened after that, Officer?

A. Mr. White let us in the home; the home was searched. * * *

Q. I see. Now, what exactly did you do in the search of these premises?

A. I searched the bedroom of Mr. White and the kitchen.

Q. I see. Now, did you find anything unusual or peculiar in the bedroom?

A. Yes, sir, I did.

Q. What was that?

A. On the bedroom table, dressing table I found a one pint bottle of Demerol. [Tr. 51836, Pp. 12 through 29].

At the hearing on petitioner's Missouri Rule 27.26 motion Detective McKinnie testified:

Q. Now, would you tell us how you happened to be to 2104 East Fifty-ninth?

A. Yes. I went there to arrest Charles White. * * *

Q. Now, upon arrival at these premises, what next happened?

A. Well, you want me to go into a story form here or do you want to ask me questions about it? * * *

Q. I believe Patrolman Coffey went around and watched the back door?

A. This is true.

Q. And you and Officer Russell approached the front door?

A. Right * * *

Q. At this time did one or both of you knock on the front door?

A. As I recall, we both knocked on the door. * * *

Q. Did either you or Officer Russell go over to a window that faced the—

A. South.

Q. —the south there?

A. Yes.

Q. What happened at the window?

A. Well, at that time the window was open and the screen was hanging by one nail. I could hear a woman screaming for help, screaming quite violently in the house. I lifted the screen off of the open window and stuck my head in to see what was causing this woman to scream for help. * * *

Q. When you looked in, what did you see?

A. I saw Charley White standing in his underwear with a roll of money in his hand. * * *

Q. And this was before or after you had knocked?

A. Let's see. I think I knocked first, then I heard the woman screaming. That caused me to go look in the window to see what the woman was screaming about. I thought someone was being hurt or injured.

Q. To shorten it up, after you entered, you found there was no woman there and the defendant told you it was the T.V. set was on?

A. It was a soap opera and she was screaming, "Stop, you are breaking my arm," and "You are hurting me," and things of that sort, and it was very realistic to me, I am on the outside, I don't know what's going on in there. * *

Q. * * * Did you observe anything else unusual at that time when you looked through the window?

A. Nothing more than a room, there was a couple of mattresses stacked up against the wall, as I recall. It was in disarray.

Q. But you didn't see anything, anything else unusual other than the defendant in his shorts standing there with money in his hand and the disarray?

A. From the window?

Q. Yes.

A. No. * * *

Q. * * * You looked in the window and saw the defendant. Did you then proceed back to the door?

A. He was coming toward the door about that time.

Q. So you pulled your head back and went around to the door?

A. Yes, sir.

Q. He then opened the door, is that right?

A. Yes, sir.

Q. At that time did you have either a search warrant or a warrant for the defendant's arrest?

A. No, sir. * * *

Q. When the defendant came to the door and opened the door you two, Officer Russell and yourself entered the premises, is that correct?

A. I told him he was under arrest. * * *

Q. Incidentally, when was the defendant first told by you or anybody else in your presence that he was

in fact placed under arrest for the possession of these specific narcotics?

A. These specific narcotics?

Q. Yes, the ones that were found.

A. Well, at the time we entered the front door, we didn't know where the narcotics were at.

Q. When you first entered the door, you placed him under arrest for possession of narcotics?

A. Yes, sir.

Q. Then you found them and went on from there?

A. Right. * * * 14

Q. Officer McKinnie, is it your best recollection that you told the defendant he was under arrest as you stood there at the door when he first opened it?

A. Yes. [Tr. 53,250, pp. 37 through 67].

14. Detective McKinnie testified at the motion to suppress hearing that petitioner was arrested for burglary (p. 14, 23–24 of Tr. No. 51836). His testimony that he arrested petitioner for possession of narcotics was given at the postconviction

hearing (p. 57 of Tr. No. 53,250). That discrepancy in Detective McKinnie's testimony is not significant under the circumstances and has not been so considered in the determination of this case.